IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32248-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD LEE DYSON, JR., | ) | PUBLISHED IN PART OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A jury found Donald Dyson guilty of two counts of first degree assault stemming from a bar parking lot fight. The jury also found by special verdict that Dyson was armed with a deadly weapon during the commission of the assaults. Dyson appeals his conviction and contends that the trial court: (1) violated his right to a public trial, (2) incorrectly instructed the jury on the definition of "deadly weapon," and, (3) incorrectly instructed the jury on transferred intent. We affirm his conviction.

At sentencing, the trial court found Donald Dyson's conduct qualified for imposition of the statutorily mandated five-year minimum term under RCW 9.94A.540 because the force employed by Dyson in committing the assaults could likely have resulted in death. Therefore, the trial court ordered the mandatory minimum confinement for each charge. On appeal, Dyson contends the judicial finding violated his right to a

jury trial. Based on the recent United States Supreme Court decision in *Alleyne v. United States*, __ U.S. __, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), we agree. We vacate Dyson's sentence and remand for resentencing.

## FACTS

One evening Julie Rodriguez-Reeves invited Donald Dyson to party with friends and her. Dyson accepted. Dyson, Rodriquez-Reeves, her roommate Jodi Morphis, and her son's girlfriend Alyssa Bishop assembled at the Corner Club bar in Spokane at 8 p.m. After an hour, the quartet moved to the Special K, another Spokane bar. At the Special K, Dyson socialized with other patrons, including Arthur Ward. Dyson and others imbibed until the bar closed. Morphis later testified she was "[p]retty sure that everyone I was with was intoxicated." Report of Proceedings (RP) at 343.

When the Special K bartender announced closing time, Donald Dyson exited to the parking lot, where he joined Julie Rodriguez-Reeves, Arthur Ward, and Alyssa Bishop. In the parking lot, Spencer Schwartzenberger, another Special K patron, sat in his Ford Explorer with music emitting from the vehicle's speaker system. Dyson enjoyed the speakers' sound, chatted with Schwartzenberger, and eventually entered the passenger seat of the Ford Explorer. After a brief conversation with Dyson, Schwartzenberger called to his friend Chris Dailey that it was time to leave. Dailey ignored Schwartzenberger's entreaty and continued to converse with Rodriguez-Reeves and Jodi Morphis. Dyson overheard Dailey invite Rodriguez-Reeves to Dailey's home and, when

2

she refused, Dailey called her crass names. Schwartzenberger confirmed that Dailey uttered "choice words" during the interaction.

Donald Dyson took offense to Chris Dailey's comments to Julie Rodriquez-Reeves, and one of the two men started an altercation. As the two men pushed and shoved, Spencer Schwartzenberger exited his Explorer and sought to end the fight. Schwartzenberger attempted to separate the two combatants by pushing them away from each other. Dyson thought Schwartzenberger had joined the clash against him. Dyson pulled and waved a knife so Schwartzenberger and Dailey would leave him alone. As he "waved" his knife, Dyson stabbed Schwartzenberger in the throat in what Schwartzenberger described as a "roundhouse-type motion." RP at 227. Dyson testified at trial that someone shoved him from behind toward Schwartzenberger, and the shove caused the wounding of Schwartzenberger.

After Donald Dyson stabbed Spencer Schwartzenberger, Arthur Ward tackled Dyson. During the struggle, Ward tried to grab the knife from Dyson's hand and was himself stabbed in the hand and cut on the temple. Dyson also twice punched Ward. Dyson arose from the tackle and walked to a friend's son's house.

## PROCEDURE

The State of Washington charged Donald Dyson with two counts of assault in the first degree. One count covered the stabbing of Spencer Schwartzenberger and the other count addressed the cutting of Arthur Ward. The State alleged that Dyson committed

3

each assault with specific intent to inflict great bodily harm with a deadly weapon or by any force or means likely to produce great bodily harm or death. The State sought a deadly weapon sentencing enhancement for each count.

During voir dire, the trial court heard the State's for-cause challenge to a venirewoman on the record at the judge's bench, out of the jury's hearing. The trial court also conducted peremptory challenges on paper. Before addressing the challenge for cause, the trial court commented to the jury:

> THE COURT: Folks, at this point the attorneys have some work to do in selecting the jury. They are going to work back and forth with a piece of paper and indicate to me what their challenges are, and so forth.
>
> This is a time strangely enough when you and I have to be present in this room, but we don't really get to do anything. We are going to sit and literally look at each other, as odd as that may seem.
>
> If you have something with you that you would like to read, be it a tablet or an actual whatever, go right ahead. Also, if you want to visit with your neighbor, that is fine; just keep the noise as low as possible so the attorneys can hear themselves think, and I will let them proceed.
>
> MR. MARTIN [State's counsel]: Your Honor, do you want us to approach for cause first?
>
> THE COURT: Yes, you can do that.
>
> (The following was held out of the hearing of the jury:)
>
> THE COURT: As to cause?
>
> MR. MARTIN: You, know, my only challenge for cause is 29. She seemed to be the one most concerned about remaining fair. That is my only challenge.
>
> MR. DRESSLER [Defense counsel]: Your Honor, by the same token she did indicate she thinks she could handle it. That is why I spoke to both of them.
>
> But I don't have challenges for cause.
>
> THE COURT: All right. Appropriate to say -- I think her answer wasn't clear enough regarding being fair in this particular case, but I don't think she's there, so I'm going to strike her for cause.

4

No. 32248-3-III
*State v. Dyson, Jr.*

That will be the only strike for cause? All right.

RP at 170-72.

During trial, Donald Dyson anticipatorily objected to the State questioning a Spokane police officer regarding the current location of Alyssa Bishop or Julie Rodriguez-Reeves and whether either had cooperated in the investigation. The trial court entertained argument from counsel concerning the objection during a sidebar conference on the record but out of the hearing of the jury.

After closing arguments, the trial court instructed the jury on the two first degree assault charges as follows:

> To convict the defendant of the crime of assault in the first degree, as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about SEPTEMBER 8, 2012, the defendant assaulted SPENCER SCHWARTZENBERGER;
> (2) That the assault was committed with a deadly weapon or by a force or means likely to produce great bodily harm or death;
> (3) That the defendant acted with intent to inflict great bodily harm; and
> (4) That the acts occurred in the State of Washington.

Clerk's Papers (CP) at 85. The trial court submitted an identical instruction for the second count of first degree assault involving Arthur Ward.

The court instructed the jury on the definition of "deadly weapon" as follows:

> Deadly weapon *also* means any weapon, device, instrument or article which under the circumstances in which it is used, attempted to be used, or threatened to be used is readily capable of causing death or substantial bodily harm.

5

CP at 82 (emphasis added). This definition of deadly weapon also appeared as part of the court's instruction on the deadly weapon special verdict with the following additional language:

> A knife having a blade longer than three inches is a deadly weapon. Whether a knife having a blade less than three inches long is a deadly weapon is a question of fact that is for you to decide.

CP at 95.

The State of Washington posited that Donald Dyson could be guilty of assaulting Arthur Ward through the doctrine of transferred intent. The State secured a jury instruction on that theory that read:

> If a person acts with intent to assault another, but the act harms a third person, the actor is also deemed to have acted with intent to assault the third person.

CP at 81. In overruling Dyson's objection to the transferred intent instruction, the trial court ruled:

> I think there is evidence, and I think that is -- if there is evidence in the case that would allow this to be argued, each side is entitled to their theory. And so regardless of what evidence may come in now, there is some evidence in the trial that would allow that instruction. So I'm going to allow that to stand.

RP at 645. During closing, the State explained the two theories under which the jury could find Dyson guilty of assault as to both Schwartzenberger and Ward:

6

But when you get down to intent, it is not essential in this case for the [S]tate to prove that Mr. Dyson intentionally assaulted Arthur Ward for you to find him guilty of assault in the first degree.

There's a legal theory that the [c]ourt instructed you on called transferred intent. And what that means is, if you believe beyond a reasonable doubt that Mr. Dyson was trying to get another shot in at Mr. Schwartzenberger, like Mr. Ward described, and that he intended the great bodily harm or to inflict more great bodily harm than he had already done, but he instead assaults a second person -- in this case they call it a third person -- and instead assaults somebody else, that the intent that he was using towards Mr. Schwartzenberger transfers to make Mr. Ward a victim in that case.

So if you find that Mr. Dyson intended to get Mr. Schwartzenberger again, and instead got Mr. Ward, you can find him guilty of assault in the first degree. Or, alternatively, you can take somewhat of what Mr. Dyson was saying, that he was slashing backward as somebody was tackling him to protect somebody else, and then he still intended great bodily harm by going towards a person's face with a knife, coming very near to his eye.

RP at 760.

The jury found Donald Dyson guilty of both counts of assault in the first degree and also found by special verdict that Dyson was armed with a deadly weapon during the commission of the assaults. On the day of the announcement of the verdict, the clerk filed the notes for both the for-cause challenge and the peremptory challenges.

At sentencing, the trial court checked a box on the sentencing form that read that Donald Dyson used force or means likely to result in death or intended to kill. This checkmark required the court to impose a mandatory minimum term of sixty months incarceration for each count. In an oral ruling, the trial court commented that Dyson

7

nearly killed Spencer Schwartzenberger in the assault. The trial court also remarked that Arthur Ward suffered permanent and significant bodily and emotional injuries.

The trial court calculated Donald Dyson's sentencing range as 144-184 months for the assault on Spencer Schwartzenberger and 117-147 months for the assault on Arthur Ward. The trial court sentenced Donald Dyson to 140 months confinement for the Schwartzenberger assault, 108 months for the Ward assault, and 24 months for the deadly weapon sentencing enhancement for each count, for a total of 296 months of confinement. The trial court also imposed a mandatory minimum sentence of five years for each count to be served consecutively.

## LAW AND ANALYSIS

On appeal, Donald Dyson seeks a new trial on the ground that the trial court violated his public trial rights and committed instructional error. Dyson also contends the trial court violated his constitutional right to trial by jury by imposing a mandatory minimum sentence. Since we publish only that portion of our opinion addressing the mandatory minimum sentence, we discuss that issue first.

*Issue 1: Whether the trial court violated Donald Dyson's right to a jury trial when imposing a mandatory minimum sentence?*

*Answer 1: Yes.*

Donald Dyson contends that the trial court violated his right to a jury trial under the United States Constitution's Sixth Amendment by finding at sentencing the facts

necessary to warrant imposing a mandatory minimum sentence of five years for each of his first degree assault convictions. He argues that a recent United States Supreme Court decision, *Alleyne v. United States*, 133 S. Ct. 2151 (2013), holds that any factual finding required to trigger a mandatory minimum sentence constitutes an element of the crime and therefore must be submitted to a jury. The State of Washington concedes error in the imposition of the mandatory minimum sentence by judicial finding. We agree with both parties and remand for resentencing.

Errors implicating a criminal defendant's Sixth Amendment right to a jury trial may be raised for the first time on appeal. *State v. Hughes*, 154 Wn.2d 118, 143, 110 P.3d 192 (2005), *abrogated on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006); *State v. O'Connell*, 137 Wn. App. 81, 89, 152 P.3d 349 (2007). Whether a sentence is legally erroneous is reviewed de novo. *In re Pers. Restraint of Brooks*, 166 Wn.2d 664, 667, 211 P.3d 1023 (2009).

The Sixth Amendment guarantees a criminal defendant the right to an impartial jury. Article I, section 21 of the Washington Constitution similarly provides, in relevant part, that "[t]he right of trial by jury shall remain inviolate." The jury serves as an intermediary between the State and a judge as an agent of the State, on the one hand, and the criminal defendant, on the other hand. *United States v. Gaudin*, 515 U.S. 506, 510-11, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995). The right to a jury trial is a great bulwark of civil and political liberties. *Alleyne v. United States*, __ U.S. __, 133 S. Ct. at 2161

(2013). When coupled with the command of the due process clause of the Fourteenth Amendment, the Sixth Amendment demands that an impartial jury find beyond a reasonable doubt all elements of the charged offense for the defendant to be convicted. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

State legislatures, including the Washington legislature, have enacted numerous sentencing mandates, factors, and enhancements that impact the punishment meted on a convicted defendant. In turn, legislatures and courts seek to distinguish between offenses and sentencing features, with the fact-finding for the crime relegated to a jury and the fact-finding for the punishment assigned to a judge. Under this distinction, a sentencing factor is not an element of the crime. Yet no principled basis exists for treating a fact increasing the term of the imprisonment differently than the facts constituting the base offense. *Alleyne*, 133 S. Ct. at 2157. The end result is the same. As the title to Fyodor Doestoevsky's novel suggests, crime and punishment go together.

Under the common law at the time of the adoption of the United States Bill of Rights, a fact essential to the penalty was an element of the crime. *Alleyne v. United States*, 133 S. Ct. at 2159. Therefore, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. at 490. The term "statutory maximum" means the maximum sentence a judge may

10

impose based solely on the jury's verdict without making any additional findings. *Blakely v. Washington*, 542 U.S. 296, 303-04, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Therefore, any fact supporting a sentencing enhancement must be either admitted by a defendant or found by the jury. *Blakely*, 542 U.S. at 304.

The U.S. Supreme Court recently clarified the holding of *Apprendi* as also applying to a trial court's imposition of a mandatory minimum sentence. *Alleyne v. United States*, 133 S. Ct. at 2160. Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. *Apprendi*, 530 U.S. at 483 n.10. Mandatory minimum sentences increase the penalty of the crime. *Alleyne*, 133 S. Ct. at 2155. Like a maximum sentence, the minimum sentence is intended to and does dictate the amount of time spent confined. Because "facts increasing the legally prescribed floor *aggravate* the punishment . . . the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." *Alleyne*, 133 S. Ct. at 2161-62. *Alleyne* overruled *Harris v. United States*, 536 U.S. 545, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002), in which the high Court held permissible judicial fact-finding that increased the mandatory minimum sentence for a crime. In fairness to the trial court, the Supreme Court decided *Alleyne* after the sentencing of Donald Dyson.

RCW 9.94A.540, Washington's mandatory minimum sentencing statute, prescribes, in relevant part:

11

(1) Except to the extent provided in subsection (3) of this section, the following minimum terms of total confinement are mandatory . . .

. . . .

(b) An offender convicted of the crime of *assault in the first degree* . . . where the offender used force or means *likely to result in death or intended to kill the victim* shall be sentenced to a term of total confinement not less than five years.

. . . .

(2) During such minimum terms of total confinement, no offender subject to the provisions of this section is eligible for community custody, earned release time, furlough, home detention, partial confinement, work crew, work release, or any other form of early release authorized under RCW 9.94A.728, or any other form of authorized leave of absence from the correctional facility while not in the direct custody of a corrections officer.

(Emphasis added.)

Under RCW 9A.36.011(1)(a), a jury, in order to find a defendant guilty of assault in the first degree, must find beyond a reasonable doubt that the defendant assaulted another person "with a firearm or any deadly weapon or by any force or means *likely to produce great bodily harm or death*." (Emphasis added.) RCW 9.94A.540 requires additional evidence to impose the mandatory minimum sentence. Under the latter statute, the defendant must have employed force likely to result in death or intended to kill, not simply force likely to cause great bodily harm. Therefore, Washington courts have held that RCW 9.94A.540's five-year mandatory minimum does not automatically attach to a first degree assault conviction. *In re Pers. Restraint of Huy Khac Tran*, 154 Wn.2d 323, 329-30, 111 P.3d 1168 (2005); *State v. McChristian*, 158 Wn. App. 392, 402-03, 241 P.3d 468 (2010). The lack of direct overlap between the assault and mandatory minimum

12

statutes indicates that the legislature intended to increase the punitive requirement for certain assaults that are characterized by unusually, within the universe of assaults, violent acts or accompanied by a particularly sinister intent. *Tran*, 154 Wn.2d at 329-30. Thus, the imposition of the mandatory minimum necessarily requires a separate factual finding beyond the jury's finding of guilt of first degree assault. *McChristian*, 158 Wn. App. at 403.

Prior to *Alleyne v. United States*, this court held that *Blakely v. Washington* did not require that a jury make findings requisite to a mandatory minimum sentence. *McChristian*, 158 Wn. App. at 403. Judicial findings were sufficient under the Sixth Amendment so long as a "mandatory minimum sentence did not increase the penalty for first degree assault beyond the statutory maximum standard range sentence." *McChristian*, 158 Wn. App. at 404. In so reasoning, this court analogized McChristian's case with a Washington Supreme Court case that held *Blakely* did not apply to exceptional minimum sentences under former RCW 9.94A.712 (2005) that do not exceed the maximum sentence allowed. *McChristian*, 158 Wn. App. at 403.

In *Alleyne v. United States*, the United States Supreme Court held that the Sixth Amendment required a jury to find beyond a reasonable doubt all of the facts necessary for a trial court to impose a mandatory minimum sentence on Allen Ryan Alleyne for using a firearm in relation to a crime of violence. The relevant statute imposed a seven-year mandatory minimum if Alleyne brandished the firearm during the crime. Although

13

the jury found that Alleyne used a firearm during the crime, it made no finding that he

brandished the weapon. The district court found that evidence supported a finding of

brandishing and sentenced Alleyne accordingly. The Supreme Court reversed. The high

Court clarified that the principle announced in *Apprendi* applies with equal force to facts

increasing the mandatory minimum. *Alleyne*, 133 S. Ct. at 2160. Therefore, a jury must

find beyond a reasonable doubt those facts that trigger a mandatory minimum sentence.

*Alleyne*, 133 S. Ct. at 2161.

In the case on appeal, the trial court, rather than the jury, found the facts necessary

to impose a mandatory five-year minimum sentence on Donald Dyson for each of his two

convictions for first degree assault. The jury's guilty verdict alone was not enough to

find that Washington's five-year mandatory minimum should apply. Under *Alleyne*, the

trial court should have submitted a separate instruction to the jury regarding the

applicability of the five-year mandatory minimum to each of Dyson's first degree assault

convictions. The mandatory floor of Dyson's sentence was as important to him as its

ceiling. Contrary to the perception of the dissent, the error is not harmless since the trial

court's fact-finding could lead to Dyson missing early release and, conversely, serving a

longer imprisonment.

Later in this opinion, we affirm the convictions of Donald Dyson. Nevertheless,

we remand for resentencing with instructions that the trial court remove the mandatory

minimum sentences for each crime. The resentencing will allow Donald Dyson to receive potential early release credits.

We vacate Donald Dyson's sentence and remand for resentencing. In the unpublished portion of this opinion we affirm Dyson's conviction.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

*Issue 2: Did the trial court violate Donald Dyson's right to a public trial?*

*Answer 2: No.*

Donald Dyson contends the trial court violated his right to a public trial when it allowed the for-cause challenge at sidebar and peremptory challenges by written notes. He also contends the trial court violated this right when it ruled on an evidentiary objection during a sidebar conference. We disagree. All three of Dyson's claimed violations of his right collapse under a spate of recent Washington decisions.

Washington's constitution guarantees both the public and the accused a right to the open administration of justice. Article I, section 10 of the Washington Constitution reads, "Justice in all cases shall be administered openly, and without unnecessary delay." This provision entitles the public and the press, as representatives of the public, to openly administered justice. *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 209, 848 P.2d 1258 (1993); *Cohen v. Everett City Council*, 85 Wn.2d 385, 388, 535 P.2d

801 (1975). Moreover, article I, section 22 of the Washington Constitution provides, in pertinent part, "In criminal prosecutions the accused shall have the right to . . . a speedy public trial."

The threshold determination when addressing an alleged violation of the public trial right is whether the event at issue even implicates the right. *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). In *Sublett*, 176 Wn.2d at 72-73, our Supreme Court adopted a two-part "experience and logic" test to address this issue: (1) whether the place and process historically have been open to the press and general public, the experience prong; and (2) whether the public access plays a significant positive role in the functioning of a particular process in question, the logic prong. *State v. Dunn*, 180 Wn. App. 570, 574-75, 321 P.3d 1283 (2014), *review denied*, 181 Wn.2d 1030, 340 P.3d 228 (2015). Both questions must be answered affirmatively to implicate the public trial right. *Sublett*, 176 Wn.2d at 73.

The Supreme Court recently approved sidebar conferences for juror challenges for cause and paper challenges for preemptory jury strikes. *State v. Love*, No. 89619-4 (Wash. July 16, 2015). Our high court held that these two practices did not amount to a courtroom closure. The court wrote:

> The public's presence in the courtroom reminds those involved about the importance of their roles and holds them accountable for misconduct. Effective public oversight of the fairness of a particular trial begins with assurance of the fairness of the particular jury.
> Yet the public had ample opportunity to oversee the selection of

16

Love's jury because no portion of the process was concealed from the public; no juror was questioned in chambers. To the contrary, observers could watch the trial judge and counsel ask questions of potential jurors, listen to the answers to those questions, see counsel exercise challenges at the bench and on paper, and ultimately evaluate the empaneled jury. The transcript of the discussion about for cause challenges and the struck juror sheet showing the peremptory challenges are both publically available. The public was present for and could scrutinize the selection of Love's jury from start to finish, affording him the safeguards of the public trial right missing in cases where we found closures of jury section. We hold the procedures used at Love's trial comport with the minimum guarantees of the public trial right and find no closure here.

Although Love argues for a broad rule that all peremptory challenges must be spoken aloud, written peremptory challenges are consistent with the public trial right so long as they are filed in the public record. Spoken peremptory challenges certainly increase the transparency of jury selection, but there are still legitimate methods of challenging jurors in writing, like the practice here, that do not amount to a courtroom closure because they are made in open court, on the record, and subject to public scrutiny.

*State v. Love*, slip op. at 8-9 (citations omitted).

The voir dire procedures about which Donald Dyson complains are identical to the procedures employed in *State v. Love*. As in *Love*, the trial court did not offend Dyson's right to a public trial.

The sidebar evidentiary conference, to which Donald Dyson assigns error, also does not implicate his right to a public trial. Recently, a plurality of our state high court held that sidebar conferences to address evidentiary questions did not violate a defendant's right to a public trial. *State v. Smith*, 181 Wn.2d 508, 515, 334 P.3d 1049 (2014). In *Smith*, four of our Supreme Court justices held that sidebar discussions and

17

No. 32248-3-III
*State v. Dyson, Jr.*

rulings on evidentiary objections did not, under the experience and logic test, implicate William Glen Smith's right to a public trial. *Smith*, 181 Wn.2d at 521. Justice Wiggins concurred in the result, but urged the court to dispose of the experience and logic test in favor of a test that presumes all trial proceedings are open and requires the trial court to conduct a *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), analysis prior to closing any proceedings. *Smith*, 181 Wn.2d at 522 (Wiggins, J., concurring in result). Justice Wiggins based his concurrence on Smith's failure to object to the closures at trial, which Wiggins thought should preclude appellate review under RAP 2.5(a). *Smith*, 181 Wn.2d at 538 (Wiggins, J., concurring in result). If we followed Justice Wiggins' concurrence, we would refuse to address Donald Dyson's challenge on appeal.

*Issue 3: Did the trial court err in its instruction to the jury on the definition of "deadly weapon?"*

*Answer 3: We decline to address this issue since Donald Dyson did not object to the jury instruction at trial and the assignment of error is not one of manifest constitutional error.*

Donald Dyson next contends that the trial court erred in its instruction to the jury defining "deadly weapon" as applied to both the first degree assault charge and the deadly weapon special verdict. He argues that the presence of the word "also" in the definition frees the jury to supply other, unspecified definitions for the deadly weapon element of assault and thus dilutes the State's burden of proof by allowing the jury to

18

convict on bases broader than the law allows. To repeat, the jury instruction read:

> Deadly weapon *also* means any weapon, device, instrument or article which under the circumstances in which it is used, attempted to be used, or threatened to be used is readily capable of causing death or substantial bodily harm.

CP at 82 (emphasis added).

Donald Dyson concedes that he did not object to the jury instruction's definition of deadly weapon at trial. He argues that this reviewing court may still review the issue because inclusion of the word "also" amounts to a manifest error affecting a constitutional right. We do not agree, and thus we decline to review this assignment of error.

RAP 2.5(a) provides, in relevant part:

> The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court . . . (3) manifest error affecting a constitutional right.

RAP 2.5(a) formalizes a fundamental principle of appellate review. No procedural principle is more familiar than that a constitutional right, or a right of any other sort, may be forfeited in criminal cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *Yakus v. United States*, 321 U.S. 414, 444, 64 S. Ct. 660, 88 L. Ed. 834 (1944).

19

Good sense lies behind the requirement that arguments be first asserted at trial. The prerequisite affords the trial court an opportunity to rule correctly on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). There is great potential for abuse when a party does not raise an issue below because a party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The theory of preservation by timely objection also addresses several other concerns. The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176 Wn.2d at 749-50; *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988).

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a)(3) allows an appellant to raise for the first time a "manifest error affecting a constitutional right," an exception on which a criminal appellant commonly relies. Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice to the

20

accused and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d at 686-87. Prohibiting all constitutional errors from being raised for the first time on appeal would result in unjust imprisonment. *State v. Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992). On the other hand, "permitting *every possible* constitutional error to be raised for the first time on appeal undermines the trial process, generates unnecessary appeals, creates undesirable retrials and is wasteful of the limited resources of prosecutors, public defenders and courts" *State v. Lynn*, 67 Wn. App. at 344.

Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d at 688. Second, perhaps perverting the term "manifest," some decisions emphasize prejudice, not obviousness. The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights. It is this showing of actual prejudice that makes the error "manifest," allowing appellate review. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009); *Scott*, 110 Wn.2d at 688; *Lynn*, 67 Wn. App. at 346. A third formulation is the facts necessary to adjudicate the claimed error must be in the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

Although Donald Dyson contends that the inclusion of the word "also" in the trial

court's instruction defining deadly weapon amounts to a manifest constitutional error, Washington law holds otherwise. A trial court's failure to include the full statutory definition of a legal term of art in a jury instruction does not constitute manifest constitutional error, so long as that omission does not relieve the State of its burden to prove all elements of the charged crime beyond a reasonable doubt. *State v. O'Hara*, 167 Wn.2d at 104. When the State's burden remains unchanged, the instruction cannot be challenged for the first time on appeal. *O'Hara*, 167 Wn.2d at 108.

Although *State v. O'Hara* addressed incomplete, rather than extraneous, language in a definitional jury instruction, its reasoning applies equally to this case. In *O'Hara*, our Supreme Court held that a trial court's inclusion of only part of the statutory definition of "malice" in its jury instruction did not constitute an error of constitutional dimension. In so holding, our high court noted the constitution only requires the jury be instructed as to each element of the offense charged and the failure of the trial court to further define one of those elements is not within the ambit of the constitutional rule. The Court further explained that the error was not manifest because "the omission did not create practical and identifiable consequences during the trial that should have been obvious to the trial court." *O'Hara*, 167 Wn.2d at 108.

As in *O'Hara*, the error alleged by Donald Dyson is neither constitutional, nor manifest. First, the trial court properly instructed the jury on the elements of first degree assault. The State was still required to prove "the assault was committed with a deadly

22

weapon or by a force or means likely to produce great bodily harm or death" beyond a reasonable doubt. CP at 85-86. Dyson provides no evidence that the mere presence of the word "also" effectively diluted the State's burden of proof such that it violated Dyson's due process rights. There is no constitutional error here.

Second, Donald Dyson points to no practical or identifiable consequences caused by the inclusion of the word "also" in the trial court's definition of deadly weapon. The undisputed facts established that Dyson employed a knife when fighting with Chris Dailey and Spencer Schwartzenberger. No witness mentioned any other weapon as involved in the assault.

*Issue 4: Did the trial court's instruction on transferred intent misstate the law and dilute the State's burden of proof?*

*Answer 4: No.*

Donald Dyson contends that the trial court's instruction to the jury on transferred intent similarly misstated the law and diluted the State's burden of proof. He argues that Washington's first degree assault statute, RCW 9A.36.011, and not the doctrine of transferred intent, dictates criminal liability for harm to an unintended victim of an intentional assault. The State responds that the trial court did not err in giving an instruction on transferred intent because the "to convict" instruction required the State prove the requisite specific intent to inflict great bodily harm on both Spencer Schwartzenberger and Arthur Ward. We agree with the State.

23

Washington's first degree assault statute provides:

> (1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
> (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or
> (b) Administers, exposes, or transmits to or causes to be taken by another, poison, the human immunodeficiency virus as defined in chapter 70.24 RCW, or any other destructive or noxious substance; or
> (c) Assaults another and inflicts great bodily harm.
> (2) Assault in the first degree is a class A felony.

RCW 9A.36.011. Washington's criminal code omits a definition of "assault," so Washington courts have adopted a common law definition that recognizes assault as:

> (1) an attempt, with unlawful force, to inflict bodily injury upon another [attempted battery]; (2) an unlawful touching with criminal intent [actual battery]; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is capable of inflicting that harm [common law assault].

*State v. Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994) (quoting *State v. Bland*, 71 Wn. App. 345, 353, 860 P.2d 1046 (1993)).

At the conclusion of Donald Dyson's trial, the trial court instructed the jury on the second form of assault: "An assault is an intentional touching or striking or cutting of another person, with unlawful force, that is harmful or offensive." CP at 79. The jury also received separate instructions on the elements of first degree assault for both Spencer Schwartzenberger and Arthur Ward.

Donald Dyson argues that the mere presence of the trial court's instruction on transferred intent lowered the State's standard of proof because the jury could find him

24

guilty of assaulting Arthur Ward by virtue of finding that Dyson intentionally assaulted Spencer Schwartzenberger. In forwarding this argument, Dyson misapprehends *State v. Wilson*, the case on which he centrally relies.

In *Wilson*, our Supreme Court interpreted RCW 9A.36.011 and determined that the language of the statute provides that any unintended victim is assaulted if he falls within the terms and conditions of the statute. In turn, our high court reversed the Court of Appeals' vacation of two counts of first degree assault against Mark Wilson.

Mark Wilson, after arguing with and threatening the bartender of Silverdale's Old Town Tavern and another patron, fired several bullets into the bar's window. The bullets struck two other individuals inside the drinking establishment. A jury found Wilson guilty of four counts of first degree assault: two counts for Wilson's unintended victims and two counts for Wilson's intended victims, the bartender and other patron. This court vacated the two convictions against the unintended victims and ruled that transferred intent did not apply under Washington's assault statute if a defendant successfully assaulted his intended victim. This court further ruled that the State must prove specific intent for unintended victims in such a circumstance.

In *Wilson*, our Supreme Court reversed this court and wrote:

> Assault in the first degree requires a specific intent; but it does not, under all circumstances, require that the specific intent match a specific victim. Consequently, once the intent to inflict great bodily harm is established, usually by proving that the defendant intended to inflict great

25

bodily harm on a specific person, the mens rea is transferred under RCW
9A.36.011 to any unintended victim.

125 Wn.2d at 218. Our state high court noted that the doctrine of transferred intent was

unnecessary for liability to attach for harm to a defendant's unintended victims. *Wilson*

125 Wn.2d at 219.

*Wilson* sanctions the State's advancement of alternate theories under which the

jury could find the requisite intent for both charges of first degree assault against Donald

Dyson. The State, consistent with *Wilson* and the jury instruction, could argue that

Dyson was culpable for each assault under a theory of specific intent to harm the victim,

or under the theory of transferred intent to harm an unintended victim. The facts lend

themselves to such a strategy since Dyson injured Arthur Ward only after he entered the

fray. Under either theory, the jury still needed to find, at least as to one victim, the

requisite mens rea beyond a reasonable doubt.

*Issue 5: Should Donald Dyson be entitled to some relief because Spencer*

*Schwartzenberger befriended Arthur Ward on Ward's Facebook page after the assault?*

*Answer 5: No.*

We now begin a review of Donald Dyson's statement of additional grounds.

Dyson complains that Spencer Schwartzenberger's memory of the events surrounding his

assault could have been influenced by his becoming friends with Arthur Ward on

Facebook before trial. Dyson highlights an excerpt from the report of proceedings in

26

which Schwartzenberger stated he did not know Ward prior to the assault, but he confirmed the existence of their on-line friendship.

A jury may believe or disbelieve a witness, since credibility determinations are solely for the trier of fact. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). Credibility determinations cannot be reviewed on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). The jury heard that Arthur Ward and Spencer Schwartzenberger befriended each other and could discount the duo's testimony if it wished. Otherwise, after hearing testimony from Schwartzenberger, Ward, and Dyson, the jury remained free to choose whose version of the facts prevailed.

*Issue 6: Was Donald Dyson's trial counsel ineffective?*

*Answer 6: No.*

Donald Dyson next contends that he received ineffective assistance due to his trial attorney's failure to submit evidence regarding Spencer Schwartzenberger's blood alcohol content level at the time of the assault, the knife wounds suffered by the victims, and Dyson's alleged posttraumatic stress disorder. A claim of ineffective assistance of counsel requires proving that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *post-conviction relief granted on other grounds by In re*

27

*Stenson*, 174 Wn.2d 474, 276 P.3d 286 (2012). This court presumes that counsel was effective. *Strickland v. Washington*, 466 U.S. 668, 689-90, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d at 335. To rebut the strong presumption that counsel's performance was effective, the defendant bears the burden of establishing the absence of any conceivable legitimate tactic explaining counsel's performance. *State v. Hamilton*, 179 Wn. App. 870, 879-80, 320 P.3d 142 (2014). Generally, the decision to call a witness will not support a claim of ineffective assistance of counsel. *Thomas*, 109 Wn.2d at 230.

Donald Dyson's claim of ineffective assistance fails because he can neither show that his counsel's performance was deficient or that he suffered prejudice as a result. Contrary to Dyson's argument, his attorney cross-examined an emergency room physician from Sacred Heart Medical Center regarding the nature of knife wounds inflicted by Dyson. Spencer Schwartzenberger's BAC (blood alcohol concentration) level was irrelevant to the charges and testimony of the level could have engendered sympathy toward Schwartzenberger because it showed him to be in a helpless state during the assault. Anyway, Dyson's attorney cross-examined Schwartzenberger about his ingestion of alcohol the night of the assault.

Donald Dyson mentioned for the first time in the case, through his statement of additional grounds, that he suffers from posttraumatic stress disorder. He furnishes no

28

No. 32248-3-III
*State v. Dyson, Jr.*

documentation confirming the ailment. He fails to explain how evidence of the disorder would have resulted in a different outcome at trial.

> *Issue 7: Did the trial court submit an erroneous self-defense jury instruction?*
>
> *Answer 7: No.*

Finally, Donald Dyson contends that the trial court submitted an incorrect instruction to the jury regarding self-defense. Dyson provides summaries of relevant case law but does not identify any mistake in the self-defense instructions given by the trial court. Nor did he object to the instructions given. The instructions provided by the trial court echoed the pattern jury instructions on self-defense. *Compare* CP 87-91 *with* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.02, 17.04, 17.05 (3d ed. 2008). Because Dyson neither objected to the self-defense instructions at trial nor identifies a constitutional error on appeal, we do not address this claimed error in accordance with RAP 2.5(a).

_____
Fearing, J.

I CONCUR:

_____
Siddoway, C.J.

29

32248-3-III

KORSMO, J. — (Dissenting) I agree with nearly all of the majority opinion except for its conclusion. The issue identified here is not a mandatory minimum sentence problem. *Alleyne v. United States*, ___ U.S. ___, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). The actual issue is one of statutory interpretation that has already been settled by *In re Pers. Restraint of Huy Khac Tran*, 154 Wn.2d 323, 111 P.3d 1168 (2005), and *State v. McChristian*, 158 Wn. App. 392, 241 P.3d 468 (2010), *review denied*, 171 Wn.2d 1003 (2011). Although there is an *Alleyne* error in this case, that error is harmless. *Alleyne* did not change the definition of "punishment" under the Sixth Amendment and does not extend the Sixth Amendment jury trial right to the collateral consequences of a factual finding that establishes a minimum sentence. Since the trial court complied with the procedure set forth in *McChristian*, I would affirm.

After struggling for many years to define the scope of the constitutional right to a jury trial as it related to sentencing, the United States Supreme Court finally cobbled together a majority to declare a rule on the topic in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at

490. The rule of *Apprendi* was then applied to Washington's determinate sentencing statute, the Sentencing Reform Act of 1981 ch. 9.94A RCW (SRA), in *Blakely v. Washington*, 542 U.S. 296, 303-05, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). The court concluded that the high end of the standard range was the "statutory maximum" to which the jury trial right applied. *Id.* at 303-04. Post-*Apprendi*, the court declined to extend its ruling to minimum sentences. *Blakely*, 542 U.S. at 304; *Harris v. United States*, 536 U.S. 545, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002).

That practice changed in *Alleyne*. At issue there was the sentence imposed following a robbery conviction. The jury determined that the defendant had carried a firearm, a fact that mandated a five year minimum sentence. 186 L. Ed. 2d at 322. The trial judge "found" that the defendant had brandished a firearm in the course of the robbery, a fact that mandated a seven year minimum sentence. *Id.* The Supreme Court overturned the brandishing sentence, with the plurality reasoning that an increased minimum sentence acted like an increased maximum sentence, both of which altered the "prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment." *Id.* at 324. The fifth vote for the result came from Justice Breyer, who would have overruled *Apprendi*, but agreed with the plurality to overturn *Harris* and remove what he considered a sentencing anomaly created by that case. *Id.* at 334-335.

2

No. 32248-3-III
*State v. Dyson* — *Dissent*

The application of the *Alleyne* opinion to RCW 9.94A.540(1)(b)[1] is now straightforward. The statute creates a mandatory minimum sentence that must, under *Alleyne*, be found by a jury. That was not done here; I agree with the majority that the lack of a finding was error. However, the *Alleyne* error was harmless.

Even with an offender score of zero, under the SRA the standard range for first degree assault has always exceeded 60 months, the minimum term set by the finding.[2] *See* Laws of 1983, ch. 115 §§ 2, 3 (establishing sentence ranges and assigning seriousness levels to offenses; creating range of 62-82 month sentence for first degree assault with offender score of zero). The minimum term finding thus had no effect on the sentencing range established by the jury's verdicts in Mr. Dyson's case. Even if a jury had made the same finding entered by the trial judge, there would have been no change in the range of incarceration Mr. Dyson faced for his actions—and thus this is not an *Alleyne* violation.

---

[1] "An offender convicted of the crime of assault in the first degree . . . where the offender used force or means likely to result in death or intended to kill the victim shall be sentenced to a term of total confinement not less than five years."

[2] It seems likely that the primary purpose of the minimum term requirement, which was enacted by Laws of 1981 ch. 137, § 12, was to influence the Sentencing Guidelines Commission when it devised the ranges and seriousness levels for the crimes. The commission's ranges subsequently were adopted by the legislature two years later. *See* Laws of 1983, ch. 115 § 1. Although no minimum sentence for first degree assault existed at the time the SRA first was enacted in 1981, there had been a five year minimum term for that offense prior to 1976. *See* Laws of 1909, ch. 249, § 161, repealed by Laws of 1975 (1st Ex. Sess.) ch. 260, § 9A.92.010(27).

3

Apparently recognizing that the *Alleyne* error was of no consequence to his

sentence range, Mr. Dyson focuses on one of the collateral consequences of that finding,

the loss of any opportunity to earn early release time during the period of the minimum

sentence. *See* RCW 9.94A.540(2). That same consequence was at issue in *Tran*. There

the court concluded that because first degree assault, even when committed with a

firearm, does not completely overlap the more limited instances of first degree assault

subject to the minimum term requirement, the Department of Corrections erred in making

its own finding and imposing the minimum term. 154 Wn.2d at 332.

This court revisited *Tran* in *McChristian*. Division Two began its analysis of the

issue by agreeing with the defendant that the minimum term statute required "a factual

finding that a defendant meets the requirements of the statute before a trial court may

impose a mandatory minimum sentence." *McChristian*, 158 Wn. App. at 402. It found

that *Tran* implicitly required a factual finding before the minimum term was imposed. *Id.*

at 403. It disagreed, however, with the defendant's argument that the Sixth Amendment

required a jury to make the finding, deciding that a judge could do so. *Id.* at 403-05.

In light of *Alleyne*, an argument can be made that *McChristian* is at least partially

defunct and that a jury, not a judge, must make the factual determination that governs the

additional consequences listed in RCW 9.94A.540(2). *McChristian* still stands, and

should still stand, unless either *Alleyne*'s definition of punishment is expanded to include

the collateral consequences of a minimum term finding or the Washington Supreme

4

Court invalidates the *McChristian* interpretation of *Tran*. Neither of those events has happened yet. Critically for this case, nothing in *Alleyne* changed the *Apprendi-Blakely* concept of what constituted "punishment" within the meaning of the Sixth Amendment right to a jury trial—the range of sentences[3] which a judge could impose based on the facts found by the jury. Whether a prisoner earns earned early release credits is not a sentencing option left to the discretion of the sentencing judge. Limitation on earned early release simply is not punishment under *Apprendi* and its progeny.

If the *Apprendi-Alleyne* conception of "punishment" is to be extended to include the opportunity to earn early release, we should acknowledge what we are doing and explain why the extension is warranted. This, however, is not the case to have that discussion. Mr. Dyson did not object to the lack of a jury finding, the court's check-box minimum term finding, or the judge's comments at sentencing concerning how fortunate it was that no one died. Under *McChristian*, these actions were enough to satisfy the statute's fact-finding requirement. Any question of statutory construction concerning the identity of the appropriate fact-finder thus was waived by the failure to raise the issue to the trial court. RAP 2.5(a). Since the United States Supreme Court has not yet extended its Sixth Amendment jurisprudence to collateral consequences of a jury's factual finding,

---

[3] Financial penalties triggered by specific factual determinations have joined incarceration on the list of what constitutes "punishment" under the Sixth Amendment. *Southern Union Co. v. United States*, ___ U.S. ___, 132 S. Ct. 2344, 183 L. Ed. 2d 318 (2012).

it is doubtful this case presents a manifest issue of constitutional error that we should be reviewing. RAP 2.5(a)(3). For both reasons, Mr. Dyson's claim should fail.

Although compliance with *Alleyne* is necessary to impose a minimum term of 60 months incarceration, the low end of the standard range for first degree assault already exceeds that amount and the jury's verdict means that the minimum term finding is at worst harmless error under *Alleyne*. Even if not required by *Alleyne*, the prudent prosecutor should seek findings in any appropriate case involving a minimum term and remove this potential issue in the future.[4]

I respectfully dissent.

_____
Korsmo, J.

---

[4] If the charging theory of first degree assault was limited to the options covered by the mandatory minimum sentence, it appears that a jury verdict alone would be sufficient to allow the trial judge to impose the minimum term without running afoul of *Alleyne*.

6